## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>STRUCTURLAM MASS TIMBER U.S., Inc. *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-10497 (CTG) |
| HEATHER L. BARLOW, AS LIQUIDATING TRUSTEE OF THE STRUCTURLAM LIQUIDATING TRUST,<br><br>    Plaintiff,<br><br>v.<br><br>WALMART, INC.,<br><br>    Defendant. | Adv. Proc. No. 25-50541 (CTG) |

## <u>MEMORANDUM OPINION</u>

Structurlam manufactured a mass timber product – a type of engineered wood that is strong enough to replace steel or concrete in building structures.[1]  The company had entered into a contract to supply its product to Walmart, which Walmart intended to use in building its new home office campus in Conway, Arkansas.[2]  A dispute between Structurlam and Walmart over the parties' performance under that contract ultimately led to the debtors filing these bankruptcy cases in April 2023.  During the bankruptcy case, the debtors sold substantially all of

---

[1] Debtors Structurlam Mass Timber U.S., Inc., Natural Outcomes, LLC, Structurlam Mass Timber Corporation, and SLP Holdings Ltd. are referred to as the "debtors."

[2] Defendant Walmart, Inc. is referred to as "Walmart."

their assets and in December 2023 confirmed a plan of liquidation under which plaintiff Heather Barlow became the trustee of the post-confirmation liquidation trust.

The trust filed this adversary proceeding as an objection to the proofs of claim that Walmart filed in the bankruptcy case (which assert claims of more than $80 million) and seeking affirmative recovery against Walmart on breach of contract and various equitable theories. While strenuously denying that it breached the contract, Walmart acknowledges that the complaint states a claim for breach. It therefore moves to dismiss the complaint only in part, arguing (a) that the contractual disclaimer of consequential damages precludes the trust from seeking to recover the costs associated with the bankruptcy case and (b) that because the parties have a contractual agreement, the equitable theories of conversion, unjust enrichment, and in *quantum meruit* are not available to recover on a claim that is governed by the terms of the contract.

The Court first addresses, as it must, the question of its subject-matter jurisdiction. While the issue is a subtle one, the Court concludes that the complaint correctly alleges that its claims, which are fundamentally asserted as counterclaims to Walmart's proofs of claim, fall within the "arising in" jurisdiction of 28 U.S.C. § 1334(b). On the merits, the Court agrees with Walmart that the contractual disclaimer of consequential damages applies and is properly enforceable. The breach of contract claims are thus dismissed to the extent they seek to recover, as damages, the costs associated with the bankruptcy case or other "consequential"

damages. And Walmart is similarly correct that the existence of the contract precludes the trust from recovering contract damages on any of the various equitable theories asserted. At argument, the trust acknowledged that contract damages were not available on those theories but raised the possibility that the debtors may have had some other claim for equitable relief against Walmart. That may be right as a matter of theory, but the Court does not read the existing complaint to seek anything other than the same damages that are sought in the breach of contract claim. The existing claims for equitable relief will therefore be dismissed. The trust's right to move for leave to amend the complaint to assert such other claims (and Walmart's right to oppose any such motion) are thus reserved.

## Factual Background

For the purposes of this partial motion to dismiss, the Court takes all well-pled allegations of the complaint as true.[3] The description of the facts set forth below are therefore the events as alleged in the complaint.

### 1.    The agreements

The parties' agreement, under which Structurlam would sell and Walmart would buy mass timber products for use in the construction of Walmart's new home office campus project was documented in two agreements, referred to by the parties as the "timber supply agreements." The parties refer to the original agreement as "TSA 1" and the amended version as "TSA 2."[4]

---

[3] *See Bell Atlantic Corp. v. Twombley,* 550 U.S. 544, 555 (2007).

[4] Because TSA 2 is the controlling agreement here, references herein to the "contract" or the "agreement" are to TSA 2. The timber products that were the subject of these agreements

As part of the parties' broader arrangement, Walmart invested in SLP, Structurlam's parent company, acquiring 34% of the preferred equity in the parent.[5] SLP in turn owned 100% of Structurlam.[6] Walmart's ownership interest in SLP gave it the power to elect three of the eleven members of SLP's board of directors.[7]

Under the original agreement – TSA 1 – executed in December 2019, Structurlam agreed to provide the Goods for approximately twelve buildings divided into various phases of construction.[8] To support the operations necessary to provide these products, Structurlam established a new manufacturing facility in Conway, Arkansas, funded by new debt and equity financing.[9] In June 2022, with construction underway on the sixth of the 12 buildings and Structurlam producing Goods for the eighth, Structurlam and Walmart entered into an amended supply agreement – TSA 2 – which, by its terms, replaced TSA 1.[10]

That amended agreement contained certain minimum quantities that Walmart agreed to purchase, approximately 700,000 cubic feet of cross laminated timber and approximately 400,000 cubic feet of glue laminated timber.[11] Beyond these minimum volume requirements, the contract, by its express terms, did not

---

are cross laminated timber and glue laminated timber. These timber products, along with steel and hardware, are referred to as the "Goods."

[5] D.I. 52 ¶ 3. SLP Holdings, Ltd. is referred to as "SLP."

[6] *Id.*

[7] *Id.* ¶ 4.

[8] *Id.* ¶ 6.

[9] *Id.*

[10] *Id.* ¶¶ 7-8.

[11] D.I. 52 ¶ 42. These amounts are referred to as the "Minimum Volume Requirements."

require Walmart to make any further purchases from Structurlam.[12]  To this end, the contract expressly stated that, beyond the Minimum Volume Requirement, "[a]ny expenditures, investments, or commitments [Structurlam] makes in reliance on future business from [Walmart] pursuant to this Agreement or otherwise are made at [Structurlam]'s own risk and without any obligation whatsoever on the part of [Walmart]," unless "explicitly provided in a Purchase Order or separate written agreement signed by both parties."[13]

The agreement provided Structurlam with certain guaranteed margins on Goods sold subject to the Minimum Volume Requirement, and a different, slightly lower, margin on Goods purchased over and beyond any Minimum Volume Requirement.[14]  Specifically, for Goods sold subject to the Minimum Volume Requirements, Walmart agreed to pay, on a cost-plus basis, a price sufficient to generate a margin of "$9.44 per cubic foot of [cross laminated timber] and $19.61 per cubic foot of [glue laminated timber]."[15]  For any Goods that may be sold in excess of the Minimum Volume Requirement, Walmart would pay Structurlam a price sufficient to generate a margin of "$8.44 per cubic foot of [cross laminated timber] and $18.61 per cubic foot of [glue laminated timber]."[16]  Additionally, Structurlam

---

[12] D.I. 52-1 § 4(b)(ii) ("Except with respect to the Minimum Volume Requirements for Goods to be purchased and supplied . . ., [Walmart] has no obligation and makes no promise to purchase any minimum amount of Goods from [Structurlam].").

[13] *Id.*

[14] D.I. 52 ¶¶ 50-51.

[15] *Id.* ¶ 50.

[16] *Id.* ¶ 51.

would receive "a 35% margin on all design, fabrication, detailing, installation and other coordination work related to custom steel timber connectors and all stock/pre-fabricated steel hardware fastener components."[17]  These stated margins sought to ensure that the project would "guarantee Structurlam a minimum profit margin of 32.5% and a maximum [profit margin] of 37.5% for Goods supplied to Walmart."[18]

As to how Goods would be supplied and paid for, the contract established certain payment terms and delivery schedules, providing that Walmart would pay – and Structurlam would perform work and supply Goods – pursuant to the relevant schedules.[19]  With each delivery, Structurlam would "issue invoices reflecting the amounts due and draw from the deposits," with Walmart "agree[ing] to pay within ten calendar days after receipt unless within the same ten days Walmart disputed any such invoice 'in good faith.'"[20]  Any such disputes were to be resolved by Walmart and Structurlam "expeditiously and in good faith," while Walmart "continue[d] performing its obligations under [the contract], . . . including [Walmart's] obligation to pay all due and undisputed invoice amounts."[21]  Further, Walmart agreed to pay interest on all late payments (except for those successfully disputed) in the amount of eight percent per annum.[22]

---

[17] *Id.* ¶ 54.

[18] *Id.* ¶ 52.

[19] *Id.* ¶ 55.

[20] D.I. 52 ¶¶ 55-56.

[21] D.I. 52-1 § 11(b).

[22] *Id.* § 12.

Concerning the Goods themselves, Structurlam agreed to "make the Goods ready for [Walmart] and available for Delivery to [Walmart] in accordance with the [relevant schedule]."[23]    The contract then obligated Walmart to inspect any manufactured Goods made available to them within 14 calendar days of receiving an inspection notice.[24] After inspection, Walmart must either accept the Goods or reject the Goods as nonconforming.[25]   Defective Goods received similar treatment, with Walmart required to provide notice within 30 days.[26]    On Walmart's timely notification of rejection or of defective Goods, Structurlam would have "the right to test the Goods for compliance with industry standards and [the contract]."[27]

The contract granted Structurlam the right to "determine, in its reasonable discretion," whether the Goods are nonconforming or defective.[28]  If the Goods were determined by Structurlam to be nonconforming or defective, Structurlam then retained sole discretion to repair or replace the nonconforming or defective Goods.[29] Should Structurlam determine, however, that the allegedly nonconforming or defective Goods were, in fact, neither nonconforming nor defective, the agreement

---

[23] *Id.* § 4(f)(ii).

[24] D.I. 52 ¶ 66.

[25] *Id.* ¶ 69; D.I. 52-1 § 8(a) (defining "nonconforming Goods" as Goods that "do not materially conform with the [agreed] specifications" or that "are materially and functionally different from Supplier-approved samples or the [agreed] specifications").  Importantly, TSA 2 notes that "normal, expected, or standard deviations of the Goods from the specifications . . . that are common in the timber supply industry are permitted and expected and shall not result in any Goods becoming Nonconforming Goods."  *Id.*

[26] D.I. 52 ¶ 76.

[27] D.I. 52-1 § 8(b).

[28] *Id.* §§ 6(e) & 8(b).

[29] *Id.* §§ 6(e)(iii) & 8(b)(ii).

obligated Walmart to accept the Goods and provided that Walmart was not "entitled to any further right of return, repair, replacement, credit, or refund with respect to such Goods."[30]

The contract states that the remedies described in §§ 6(e) and 8(b) for defective and nonconforming goods, respectively, are Walmart's exclusive remedies.[31]  Should any Goods be subject to a "recall," Structurlam would be responsible for all costs associated with the recall.[32]  Accepting the return of nonconforming, defective, or recalled Goods all constitute events of default under the contract.[33]  In the event of default, Walmart first must provide a notice, which triggers a 20-day cure period.[34] Should Structurlam fail to cure within the cure period, the agreement provides Walmart with certain remedies, including termination of the contract, termination of outstanding purchase orders, and the ability to return Goods.[35]

The agreement also contains limits on the types of damages one party may recover from the other and sets a cap on the amount of damages that may be recovered.[36]  Concerning the types of damages that may be recovered, the contract

---

[30] *Id.* §§ 6(e)(v) & 8(b)(iv).

[31] *Id.* § 8(b)(iv).

[32] *Id.* § 8(c).  "Recall" is defined as "any removal of Goods from the stream of commerce and issued by Supplier or a government entity."  *Id.* § 1(m).

[33] D.I. 52 ¶ 139 (Events of default under TSA 2 include "if Structurlam (1) lost exclusivity with respect to Goods, (2) accepted return of Defective Goods, (3) accepted return of Nonconforming Goods, (4) accepted return of Goods subjected to Recall, subject to certain volume thresholds, and/or (5) failed to fully and timely perform its delivery obligations.").

[34] *Id.* ¶ 140.

[35] *Id.*

[36] D.I. 52-1 § 23.

made clear that "in no event shall either party be liable to the other party for any punitive, special, incidental, or consequential damages of any kind (including lost profits, business revenues, business interruption and the like)."[37]  This limitation applies broadly, including to situations concerning "(i) the relationship between [Structurlam] and [Walmart], including all prior dealings and agreements; (ii) the conduct of business under this agreement or any purchase order; (iii) breach of this agreement or any purchase order; or (iv) termination of business relations between the parties."[38]  The contract also clarifies that the limitation applies regardless of the type of claim under which such damages are sought.[39]

Separately, for damages not explicitly and entirely barred by the language in § 23(a), the agreement capped the liability of either party on any claim of any kind to:

> (i) the total of the amounts paid hereunder by [Walmart] in the twelve (12) month period preceding the event giving rise to the claim; and (ii) in the event that [Walmart] has not paid monies for a full twelve (12) month period, then the total of the amounts anticipated to be paid hereunder by [Walmart] in the first twelve (12) month period during which payments would be made.[40]

Certain limited categories of damages are excluded from this cap, including relevant indemnification obligations, confidentiality obligations, damages resulting

---

[37] *Id.* § 23(a).

[38] *Id.*

[39] *Id.* (stating that the limitation applies "regardless of whether the claim under which such damages are sought is based upon breach of warranty, breach of contract, negligence, tort, strict liability, statute, regulation, or any other legal theory or law").

[40] *Id.* § 23(b).

from fraud or willful misconduct, or either party's repudiation of the contract in a manner not permitted by the contract.

### 2.      The disputes

In July 2022, Walmart sent Structurlam certain "need by dates" for cross laminated timber necessary for construction.[41]  Walmart then requested changes to the delivery schedule, accelerating the production and delivery of cross laminated timber for one building.[42]  This acceleration placed strain on Structurlam's production capacities and its ability to comply with the delivery schedule.[43]  Despite this, Structurlam accommodated Walmart's adjustment, and made the adjusted delivery ahead of schedule.[44]

In August 2022, Walmart redesigned six of the eight major structures, demanding a further adjustment to the delivery schedule.[45]  Around this time, Walmart notified Structurlam that Walmart did not intend to purchase any amounts of Goods over the Minimum Volume Requirements.[46]  The redesign and notice altered the margin Structurlam expected to enjoy from the project.[47] Structurlam and Walmart then engaged in negotiations in an attempt to craft a reasonable delivery

---

[41] D.I. 52 ¶ 80.

[42] *Id.* ¶ 81.

[43] *Id.* ¶¶ 82-83.

[44] *Id.* ¶ 86.

[45] *Id.* ¶ 87.

[46] *Id.* ¶ 88.

[47] D.I. 52 ¶ 88.

schedule and maintain the minimum margin – negotiations that proved unsuccessful.[48]

In October 2022, Walmart allegedly failed to inspect or pick up cross laminated timber made available for inspection and delivery.[49]  It is further alleged that Walmart failed to pay invoices for delivered and accepted Goods as required by the contract on approximately 13 occasions, including delays of more than 90 days.[50]

On November 12, 2022, Structurlam discovered a "data-process deviation" affecting certain glue laminated timber that had already been accepted by Walmart.[51] On November 15, 2022, Structurlam notified Walmart of the deviation and recommended Walmart pause work on the project to evaluate the impact of the deviation.[52] On November 16, 2022, Structurlam notified the engineer of record about the issue and created a spreadsheet identifying all affected Goods.[53]  Shortly after discovery, Structurlam addressed and fixed the deviation and continued to produce conforming Goods for the project.[54]

On November 18, 2022, Walmart delivered a "Notice of Defective Goods" relating to the Goods subject to the deviation and suspended further acceptance of manufactured Goods until such time as Structurlam could certify all glue laminated

---

[48] *Id.* ¶¶ 90-91.

[49] *Id.* ¶¶ 98-100.

[50] *Id.* ¶ 95.

[51] *Id.* ¶ 101.

[52] *Id.* ¶ 102.

[53] D.I. 52 ¶¶ 103-104.

[54] *Id.* ¶ 105.

timber, already provided and to be provided, complied with the agreed specifications.[55]  Thereafter, Structurlam engaged an engineering firm to evaluate the glue laminated timber and determine whether the Goods conformed with the agreed specifications under the contract and how to remedy any defects that may exist.[56]  During this time, Walmart refused to allow its project engineer to communicate with either Structurlam or the engineering firm Structurlam had retained.[57]

On November 30, 2022, Walmart delivered a "Notice of Nonconforming Goods" relating to the glue laminated timber subject to the deviation and further declared that the November 16 spreadsheet constituted a "recall" under the agreement.[58]  In this notice, Walmart refused to accept delivery of any further Goods and rejected Structurlam's delivery of Goods.[59]  Walmart then imposed additional conditions on further acceptances, requiring Structurlam to "certify in each attempted delivery that all Goods included in such delivery are free from defects and fit for construction pursuant to a signed Inspection Notice."[60]  Additionally, Walmart issued a dispute of invoices relating to already-accepted Goods and refused to pay further invoices until Structurlam met the new certification requirement.[61]

---

[55] *Id.* ¶ 106.

[56] *Id.* ¶ 109.

[57] *Id.*

[58] *Id.* ¶ 110.

[59] D.I. 52 ¶ 112.

[60] *Id.* ¶ 113.

[61] *Id.* ¶ 114.

On December 1, 2022, Structurlam delivered to Walmart a formal report prepared by its engineering firm that revealed that the disputed glue laminated timber "met or exceeded the requirements, . . . rendering the Goods conforming" under the contract.[62]  On December 2, 2022, Walmart confirmed receipt of the report but continued to refuse to accept Goods and refused to pay invoices.[63]  On December 6, 2022, Structurlam again certified to Walmart that the Goods were conforming and requested that Walmart resume accepting Goods and pay outstanding invoices.[64]  On the same day, Walmart rejected the conclusions of the engineering firm's report as not "relevant," but provided no explanation.  Walmart further reiterated that it would continue to refuse delivery of Goods and would refuse to pay outstanding invoices until Structurlam met the newly imposed "certification" requirement.[65]

On December 8, 2022, representatives of Structurlam, Walmart, and engineering firms retained by both sides met in an attempt to understand and resolve Walmart's rejection of the conclusions set out in the report prepared by Structurlam's engineering firm.[66]  At this meeting, Structurlam proposed to resolve any dispute by agreeing to replace any Goods of concern identified by Walmart's engineering firm.[67]  Walmart rejected this proposal and demanded a comprehensive remediation plan for

---

[62] *Id.* ¶ 116.

[63] *Id.* ¶ 119.

[64] *Id.* ¶ 120.

[65] D.I. 52 ¶ 121.

[66] *Id.* ¶ 123.

[67] *Id.* ¶ 124.

the Goods that Structurlam and its engineering firm had already determined were conforming.[68]

On December 13, 2022, Walmart terminated Structurlam's exclusivity with respect to the future phases of the project, citing Structurlam's failure to cure the defective Goods.[69]  Structurlam and its engineering firm had already determined there to be no defective Goods.[70]  On December 16, 2022, in an attempt to satisfy Walmart and despite the fact that the contract did not require it, Structurlam certified that the purported nonconforming Goods met the agreed specifications.[71] Structurlam additionally offered – in an attempt to ensure the satisfaction of Walmart – to deliver 175 pieces of glue laminated timber at no charge to Walmart.[72] In return, Structurlam requested that Walmart accept delivery for conforming Goods, work to redesign the project to maintain Structurlam's margin, and immediately resume payments due on outstanding invoices.[73]  Walmart rejected the proposal and demanded that the glue laminated timber be certified by a third-party licensed engineering firm.[74]  Structurlam again reiterated its determination that the Goods were conforming.[75]

---

[68] *Id.* ¶ 125.

[69] *Id.* ¶ 128.

[70] *Id.* ¶¶ 116-118.

[71] D.I. 52 ¶ 131.

[72] *Id.* ¶ 133.

[73] *Id.* ¶ 134.

[74] *Id.* ¶ 135.

[75] *Id.* ¶ 136.

In a further attempt to satisfy Walmart, Structurlam retained APA – The Engineered Wood Association to conduct an audit concerning whether the Goods were conforming.[76]  On December 21, 2022, before the APA could complete the audit, Walmart delivered a "Notice of Default," with cure requirements that included information and certification demands not required under the contract.[77]  On December 22, 2022, Structurlam notified Walmart that the APA's audit of Structurlam's facility confirmed that Structurlam remedied any deviation on November 18, 2022, and all products manufactured thereafter complied with the accepted specifications.[78]  On December 24, 2022, Walmart rejected the APA certification as "piecemeal" and again demanded a single "comprehensive plan" to address its concerns.[79]  On December 27, 2022, Structurlam provided Walmart with the "beam-by-beam" records from which the APA conducted its audit, and provided another report, this time a review conducted by Aspect Structural Engineers of the report provided by Structurlam's original engineering consultant.[80]  On January 5, 2023, the APA certified that a further 458 pieces of glue laminated timber conformed to the agreed specifications.[81]

---

[76] *Id.* ¶ 137.

[77] D.I. 52 ¶¶ 138-142.

[78] *Id.* ¶ 146.

[79] *Id.* ¶ 149.

[80] *Id.* ¶ 150.

[81] *Id.* ¶¶ 151-152.

On January 11, 2023, Walmart issued a "Notice of Termination," asserting that Walmart had withdrawn exclusivity, that Structurlam had failed fully and timely to perform its delivery obligations, and that Structurlam had failed to cure within the cure period.[82]   On January 15, 2023, Structurlam delivered a proposal to Walmart with minimum terms for a financially feasible arrangement to continue production.[83] On January 17, 2023, Walmart rejected the proposal.[84]

### Procedural Background

In March 2023, Structurlam, SLP, and the other debtors filed these bankruptcy cases.[85]   In July 2023, Walmart filed proofs of claim totaling more than $80 million, for (1) amounts paid for defective, nonconforming, rejected, nondelivered, or returned Goods and (2) the direct costs incurred in procuring replacement Goods and materials.[86]   In April 2025, the Liquidating Trustee filed the instant action, asserting claims for breach of contract (Count I), equitable subordination pursuant to 11 U.S.C. § 510(c) (Count IV), conversion (Count V), unjust enrichment (Count VI), and in *quantum meruit* (Count VII), while also objecting to the Walmart proofs of claim (Counts II and III).[87]   Thereafter, in June 2025, Walmart filed a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking dismissal of (i) the attempted recovery of consequential damages as relief and (ii) the alternative

---

[82] *Id.* ¶ 157.

[83] D.I. 52 ¶ 160.

[84] *Id.* ¶ 161.

[85] *Id.* ¶ 164.

[86] *Id.* ¶¶ 166-167.

[87] D.I. 52 ¶¶ 168-243.

causes of action for conversion (Count V), in *quantum meruit* (Count VI), and for unjust enrichment (Count VII).[88]  After that motion was fully briefed, the Court heard argument on the motion on October 20, 2025.

## Jurisdiction

Paragraph 38 of the complaint alleges that this Court has jurisdiction under 28 U.S.C. § 1334(b) but does not identify which basis for jurisdiction – that the case "arises under" the Bankruptcy Code, that it "arises in" a bankruptcy case, or is "related to" the bankruptcy case – is applicable.[89]  Paragraph 39, however, goes on to explain that venue is proper because this adversary proceeding "arises in cases commenced under the Bankruptcy Code."[90]  The complaint further contends that this is "core proceeding" on which the Court may enter final judgment.[91]  Walmart does not challenge jurisdiction and expressly consents to this Court's entry of final judgment.[92]

Although jurisdiction is not contested, federal courts are obligated to assure themselves of their subject-matter jurisdiction before addressing a dispute on the

---

[88] D.I. 16.  Rule 12 of the Federal Rules of Civil Procedure is made applicable to this proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure.

[89] D.I. 52 ¶ 38.

[90] *Id.* ¶ 39.

[91] *Id.* ¶¶ 40-41.

[92] D.I. 41 at 23.  (Walmart's motion to dismiss does not contain internal page numbers.  The Court will cite to the opposition by pointing to the page number "of 24" contained in the header on the top of each page affixed by the Court's electronic filing system.)

merits.[93]  Because the basis for subject-matter jurisdiction here is at least contestable,

the Court believes it appropriate to set forth the reasons why the Court agrees with

the parties that it has jurisdiction here.

Section 1334(b) of title 28 grants the district courts jurisdiction over "all civil

proceedings arising under title 11, or arising in or related to cases under title 11."[94]

As the Third Circuit explained in *Essar Steel*:

> A case "arises under" the Bankruptcy Code when the cause of action is
> based on a right or remedy expressly provided by the Bankruptcy Code.
> Proceedings "arising in" a case under the Bankruptcy Code include
> matters that, though not explicitly mentioned in the Code, would not
> exist outside of bankruptcy.  Related matters are generally causes of
> action under state law that are imported into the bankruptcy because of
> their impact on the size of the debtor's estate, and hence the distribution
> to the debtor's creditors.[95]

While the dispute over the allowance and the equitable subordination of

Walmart's claims against the estate may be said to arise under the Bankruptcy Code

(§§ 502 and 510), the breach of contract and various equitable causes of action do not.

So to the extent there is jurisdiction over those claims, it is because the claims "arise

in" a bankruptcy case or are "related to" the bankruptcy case.

Had the breach of contract and equitable subordination claims been asserted

before confirmation of the plan, they would fall within the "related to" jurisdiction

---

[93] *See generally Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("Courts … have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."); *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 267 (3d Cir. 2016) (same).

[94] 28 U.S.C. § 1334(b).

[95] *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 197 (3d Cir. 2022) (citation and brackets omitted).  *See also Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (describing the categories of bankruptcy jurisdiction).

because their resolution would have a "conceivable effect" on the estate.[96]  But the Third Circuit explained in *Resorts* that this jurisdiction narrows after confirmation (since, once a chapter 11 plan becomes effective, there is no longer a bankruptcy estate at all).[97]  But even so, the related-to jurisdiction continues to exist post-confirmation as to matters that have a "close nexus" to the confirmed plan.  What counts as a "close nexus," however, gets a little bit squishy.

That issue is particularly important, *Resorts* explained, in cases like this one where "the plan has been confirmed, but former creditors are relegated to the trust res for payment on account of their claims."[98]  In such cases, the "question is how close a connection warrants post-confirmation bankruptcy jurisdiction.  Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus."[99]

At the extremes, the answers are clear enough.  On one side, if there is a claim that involves the interpretation or enforcement of the plan, the bankruptcy court

---

[96] *See generally In re Pacor, Inc.,* 743 F.2d 984, 994 (3d Cir. 1984); *In re Federal-Mogul Global*, 300 F.3d 368, 378-384 (3d Cir. 2002); *In re Healthcare Real Estate Partners*, 639 B.R. 294, 304 (Bankr. D. Del. 2022).

[97] *In re Resorts Intern., Inc.*, 372 F.3d 154, 165 (3d Cir. 2004) ("At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred.").

[98] *Id.*

[99] *Id.*  Another factor courts in this district have considered is the degree of specificity with which the plan describes the cause of action, on the theory that "[i]f the litigation is truly so critical to the Plan's implementation, it [will be] more specifically described in the Disclosure Statement and Plan."  *In re Insilco Technologies, Inc.*, 330 B.R. 512, 525 (Bankr. D. Del 2005).

retains related-to jurisdiction over such a dispute.[100]   On the other, where a post-confirmation trust is established under an ordinary waterfall plan, and the trust brings a state-law claim only generally described in the plan, the proceeds of which will go to pay creditors, that is typically insufficient.[101]

This case falls somewhere between the extremes.  The argument against the exercise of related-to jurisdiction is that the claims at issue do not involve a construction, interpretation, or analysis of the plan in any way.  These are claims under Arkansas law for breach of contract and equitable relief assigned under a generic plan provision – much more like the kinds of claims that *Resorts* found to be insufficient (relying on *Haws*) than like the ones it found to be within the related-to jurisdiction (like *A.H. Robins* and *Falise*).  On the other hand, however, the dispute with Walmart appears to have been *the* precipitating event that led to the filing of the Structurlam bankruptcy case, and the potential estate claims against Walmart could be among the creditors' most substantial sources of recovery.  Whether that is sufficient to count as a "close nexus" under *Resorts* would appear to be a debatable proposition.  The Court need not resolve that, however, as it concludes that the case falls within § 1334(b)'s "arising in" jurisdiction.

---

[100] *Id.* at 167 (describing *In re A.H. Robins Co.*, 86 F.3d 364 (4th Cir. 1996), and *Falise v. Am. Tobacco Co.*, 241 B.R. 48 (E.D.N.Y. 1999) as cases in which post-confirmation disputes were sufficiently tied to the meaning of the plan that they fell within the related-to jurisdiction).

[101] *Id.* at 168 (describing *In re Haws*, 158 B.R. 965 (Bankr. S.D. Tex. 1993), as one in which the "only nexus to this bankruptcy case is that the plaintiff in this matter is a liquidating trustee representing a group of creditors appointed pursuant to the confirmed plan of reorganization").

The Court notes, as an initial matter, that the scope of the "arising in" jurisdiction is something of a riddle.  In view of the principle that statutes should generally be read so that "no clause, sentence or word shall be superfluous, void, or insignificant," the "arising in" jurisdiction should cover *something* that is not otherwise a matter that arises under the Bankruptcy Code (and thus falls within the "arising under" jurisdiction) or that has an effect on the bankruptcy estate (and thus falls within the "related to" jurisdiction).[102]  The cases say that the matters "arise in a bankruptcy case if they have no existence outside of the bankruptcy."[103]

But what does that mean?  *Collier* says that this category "includes such things as administrative matters, orders to turn over property of the estate" and "determinations of the validity, extent, or priority of liens."[104]  That answer, however, is rather unsatisfying, since a turnover action and a dispute over the validity, extent, or priority of a lien would all arise under the Bankruptcy Code, and thus do nothing to give the "arising in" category independent content.[105]  In language that was not strictly necessary to  its resolution of the dispute before it, the Third Circuit decision in *Stoe* repeated the statement from *Collier* before explaining that the "arising in" jurisdiction is limited to matters that would not exist outside of bankruptcy.[106]

---

[102] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal citation and quotation omitted).

[103] *Stoe*, 436 F.3d at 216 (internal quotation and citation omitted).

[104] 1 *Collier on Bankruptcy* ¶ 3.01[3][e][iv] (16th ed. 2025).

[105] *See* 11 U.S.C. § 542 (creating an obligation to turn over property of the estate to the trustee); *id.* §§ 506, 510 (addressing the allowance and subordination of secured claims).

[106] *Stoe*, 436 F.3d at 218.

Simply as a matter of logic, there are at least two kinds of claims that would appear to fit within this category. One would be an action to enforce a right under the Bankruptcy Rules (but not the Bankruptcy Code), such as a motion to take a Rule 2004 examination. To be sure, the examination of the debtor's financial condition under Rule 2004 might affect the bankruptcy estate. But showing such an effect is not a prerequisite to obtaining the authority to take a Rule 2004 examination. And such an examination may occur only in bankruptcy. The subject-matter jurisdiction for such a request is therefore the "arising in" jurisdiction.

Another would be a counterclaim to a proof of claim, when it is filed *after* confirmation. Before confirmation, such a claim would be within the related-to jurisdiction, as it would have an effect on the estate. But post-confirmation, such a counterclaim might not have a "close nexus" to the plan. Because a counterclaim to a proof of claim could not exist in the absence of a bankruptcy case, such a claim would nevertheless be within the bankruptcy jurisdiction as an "arising in" matter.[107]

Further support for the proposition that a counterclaim to a proof of claim falls within the "arising in" jurisdiction can be found in 28 U.S.C. § 157(b)(2)(C), which

---

[107] Caselaw also suggests that there is a third category of claims that may fit within the "arising in" jurisdiction – cases in which the acts that give rise to the claim itself are actions that "go to the heart" of the bankruptcy case. *See, e.g.*, *In re Seven Fields Development Corp.*, 505 F.3d 237, 262 (3d Cir. 2007) (malpractice claim against the debtors' accountant was within the "arising in" jurisdiction because it was an "action against an accountant for misconduct during the bankruptcy on which the bankruptcy judge relied in confirming the plan of reorganization, and in reliance on which the bankruptcy court approved the fees to the accountants, and on which appellants' representatives relied to their detriment in selling the assets to pay their claims"); *In re Aerocision Parent, LLC*, 667 B.R. 1, 8 (Bankr. D. Del. 2025) (action for breach of a restructuring support agreement "arises in" a bankruptcy case because such agreements "go directly to the heart of a bankruptcy case – the restructuring of the debtor-creditor relationship through the confirmation process").

lists counterclaims against parties who file proofs of claim against the estate as "core matters." The Third Circuit explained in *Essar Steel* that the items listed as core matters are those that fall within either the "arising under" or "arising in" head of jurisdiction.[108] And while a counterclaim against a creditor that files a proof of claim *might* arise under the Bankruptcy Code, there is no necessary reason why it must. Accordingly, the inclusion of counterclaims to proofs of claim as "core matters" confirms that such a matter must fall under the "arising in" jurisdiction.[109] Fairly understood, this lawsuit amounts to a counterclaim by the liquidating trust to the

---

[108] *Essar Steel*, 47 F.3d at 198.

[109] A highly regarded bankruptcy scholar suggests that the entire body of law that has grown up under § 1334(b) is incorrect. He argues that while the caselaw correctly recognizes that matters arising under federal bankruptcy law are "arising under matters," the rest of the doctrine, beginning with the Third Circuit's decision in *Pacor*, is misguided. In his view, the "arising in" jurisdiction was intended to capture all non-bankruptcy claims either by or against the estate; with the "related to" jurisdiction capturing claims between third parties that stem from the same events as a claim that is otherwise within the bankruptcy jurisdiction. *See* Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 William & Mary L. Rev. 743 (2000); Ralph Brubaker, *One Hundred Years of Federal Bankruptcy Law and Still Clinging to an* In Rem *Model of Bankruptcy Jurisdiction*, 15 Bankr. Dev. J. 261 (1999).

Professor Brubaker's approach does have the virtues of (a) avoiding the need to engage in the gymnastics described above in order to give meaning to the "arising in" category and (b) creating a true form of "supplemental jurisdiction" in the "related to" category, which would avoid the inefficiencies created by the way in which title 28 otherwise addresses supplemental jurisdiction in bankruptcy. *See In re Semcrude*, No. 08-11525 (BLS), 2010 WL 5140487 at *18 (Bankr. D. Del Dec. 13, 2010) (concluding that the exclusion of § 1367 supplemental jurisdiction from the kinds of jurisdiction that may be referred to the bankruptcy court under § 157(a) suggests that supplemental jurisdiction is not available in a case otherwise within the district court's bankruptcy jurisdiction of 1334(b)); *Healthcare Real Estate*, 639 B.R. at 305 (adopting *Semcrude*'s analysis of this issue).

But regardless of whether it may be persuasive as a matter of first principles, Professor Brubaker's analysis cannot be squared with the Third Circuit's decision in *Pacor* or the substantial body of law that has developed in the intervening decades, based on the notion set out in *Pacor* that the "related to" jurisdiction covers any matter with a "conceivable effect" on the bankruptcy estate. Accordingly, regardless of the persuasive force that this scholarship may have, this Court is duty bound to follow *Pacor* and its progeny.

proofs of claim filed by Walmart. The Court is accordingly satisfied that the case is within the district court's "arising in" jurisdiction under 28 U.S.C. § 157(b).

Under 28 U.S.C. § 157(a), the district court may refer any of the jurisdiction within its § 1334(b) jurisdiction to the bankruptcy court. By standing order dated February 29, 2012, the U.S. District Court for the District of Delaware has referred all such cases within its jurisdiction to this Court. That leaves only the question whether this Court has the authority to enter a final judgment in this matter.

As an "arising in" matter, § 157(b) would make this a core matter over which this Court would have the authority to enter final judgment even absent the consent of the parties. But *Stern v. Marshall* similarly involved a counterclaim to a proof of claim. The Supreme Court held there that when such a counterclaim is a matter of "private right," as the contract and equitable claims asserted by the trust against Walmart surely are, the literal application of § 157(b) would deprive the counterclaim defendant of its right to an adjudication before an Article III tribunal.[110] The Supreme Court's subsequent decision in *Wellness*, however, holds that the bankruptcy court may enter final judgment in such a matter if all parties consent to it.[111] As described above, both parties here have consented to this Court's entry of final judgment. The Court accordingly has the authority to do so.

---

[110] *Stern v. Marshall*, 564 U.S. 462 (2011).

[111] *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

## Analysis

With respect to a motion to dismiss, the Court must determine whether the complaint's factual allegations are sufficient to state the claims alleged. The Federal Rules of Civil Procedure require only a "short plain statement of the claim showing that the pleader is entitled to relief."[112] Civil Rule 9 requires particularity when the plaintiff alleges fraud or mistake, but intent and knowledge may be alleged generally.[113] The purpose of these rules is to place defendants fairly on notice of the conduct charged in the case.

Giving effect to the Supreme Court's decisions in *Iqbal* and *Twombly*, the Third Circuit has set forth a two-step analysis for a court's consideration of a motion to dismiss.[114] *First*, the court should separate the factual and legal elements of a claim, accepting all well-pleaded facts as true while disregarding any allegations that are merely conclusory. *Second*, the court is to assess whether the facts alleged are sufficient to show a plaintiff has a plausible claim for relief.[115]

## I.    The parties' agreement expressly bars the recovery of consequential damages.

On a claim for breach of a contract, a party may typically recover compensatory damages. Such damages are awarded to "mak[e] the injured party . . . as nearly as

---

[112] Fed. R. Civ. P. 8(a)(2) (made applicable by Fed. R. Bankr. P. 7008).

[113] Fed. R. Civ. P. 9(b) (made applicable by Fed. R. Bankr. P. 7009).

[114] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009).

[115] *Fowler*, 578 F.3d at 210-211.

possible, whole."[116]  This seeks to put the injured party in the position they would have been had the breach not occurred.

On the other hand, consequential damages, a type of special damage, involve "damage, loss or injury" that "does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act."[117]  This category of damages has been described as "elusive," "ambiguous," and "equivocal," but "typically embrace[s] such indirect and uncompensated losses as good will, business profits, removal expenses, and losses resulting from obstruction to light, air, view and access."[118]  The recovery of this type of damages may be "limited or excluded," unless such limitation is unconscionable.[119]

The liquidating trust here seeks to recover multiple categories of consequential damages through the complaint.  Specifically, it seeks to recover (1) "the costs and

---

[116] *First Service Corp. v. Schumacher*, 702 S.W.2d 412, 415 (Ark. Ct. App. 1985) (citations omitted).  The parties here agree that the contract is governed by Arkansas law.  There is no suggestion, however, that on any of the points at issue here, Arkansas law departs from general principles of contract law.  Arkansas enacted its version of UCC Article 2 as Arkansas Code § 4-2, which controls here as the dispute is over a "transactions in goods."  Ark. Code Ann. § 4-2-102.  The Court accordingly relies both on Arkansas caselaw and on other authority setting forth ordinary principles of contract law.

[117] *Smith v. Walt Bennett Ford, Inc.*, 864 S.W.2d 817, 825 (Arkansas 1993) (internal citations omitted).

[118] Emerson G. Spies & John C. McCoid II, *Recovery of Consequential Damages in Eminent Domain*, 48 Va. L. Rev. 437, 440-41 (1962).

[119] Ark. Code Ann. § 4-2-719(3).  It should be noted that at argument on the motion, counsel for the trust argued (for the first time) that the disclaimer of consequential damages was unconscionable.  Because that argument was not presented by the trust in its briefs, this Court will not address the issue.  *See generally United States v. Dowdell,* 70 F.4th 134, 140-141 (3d Cir. 2023) (addressing forfeiture of arguments that are not raised by the parties in a timely fashion); *Mirtech, Inc. v. Agrofresh, Inc.,* No. 20-1170, 2023 WL 3996618, at *6 (D. Del. June 14, 2023) (same).

expenses [Structurlam] incurred due to being forced into bankruptcy by Walmart" and (2) "compensation for the loss in enterprise value resulting from the cessation of Debtors' business operations."[120]  Both of these types of damages are consequential damages.    *First*, the "costs and expenses" of bankruptcy were incurred *as a consequence* of Walmart's alleged breach of the contract.[121]    *Second*, the "loss in enterprise value" sought to be recovered is stated in the complaint to be "resulting from the cessation of the Debtor's business operations," not directly from Walmart's alleged breach.[122]    Because (a) the contract expressly disclaims the recovery of consequential damages, (b) that provision does not cause the agreement to fail of its essential purpose, and (c) there is no allegation of an inconsistent "tacit agreement" to permit such damages, the trust's request to recover these damages will be dismissed.

### A.    The contract expressly bars the recovery of consequential damages.

The contract contains two different subsections pertaining to the limitation of the liability of the parties.[123]  In the first subsection, § 23(a), the contract limits the *types* of damages that may be recovered.  In the second subsection, § 23(b), the contract limits the *amount* of damages that may be recovered, subject to certain

---

[120] D.I. 52 ¶ 175.

[121] *See e.g. Roberts v. United States*, 18 Cl. Ct. 351, 358 (1989) ("[B]ankruptcy expense[s] ... are consequential damages.").

[122] *See London Luxury, LLC v. Walmart, Inc.*, No. 5:22- CV-5059, 2024 WL 1025125, at *24 (W.D. Ark. Mar. 8, 2024) (analyzing claim for diminution of value as consequential damages); *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) (loss of an income-producing asset with an ascertainable market value considered consequential damages).

[123] D.I. 52-1 § 23.

excepted categories.  The exceptions contained in § 23(b), however, do not operate as exclusions from § 23(a)'s disclaimer of consequential damages.

### 1.   Section 23(a) excludes consequential damages.

*First*, § 23(a) limits the types of damages that a party may recover for breach.[124] Specifically it states that "in no event shall either party be liable to the other party for any . . . consequential damages of any kind (including lost profits, business revenues, business interruption and the like)."[125]  The agreement makes clear that the bar of consequential damages applies broadly to "the relationship between [Structurlam] and [Walmart]," including to the contract, the breach of the contract, and any prior dealings and agreements.[126]  Moreover, the bar to recovery of consequential damages applies broadly "regardless" of claim type, barring claims "based upon breach of warranty, breach of contract, negligence, tort, strict liability, statute, regulation, or any other legal theory or law."[127]  Here, the relevant damages sought are consequential, as explained above.  As such, the language of the agreement expressly bars their recovery.

---

[124] *Id.* § 23(a).

[125] *Id.*

[126] *Id.*

[127] *Id.*

2.   **Section 23(b) imposes a damages cap, subject to exclusions; the exclusions from §23(b)'s cap are not exclusions from § 23(a)'s disclaimer of consequential damages.**

*Second*, § 23(b) sets a cap on the amount of damages that may be recovered.[128] Generally, the agreement provides that neither party may recover more than "the total of the amounts paid hereunder by [Walmart] in the twelve (12) month period preceding the event giving rise to the claim."[129]  Certain types of damages, however, are excluded from this cap.  To that end, § 23(b) states that the cap does not apply to Walmart's payment obligations, any indemnity obligations, any confidentiality obligations, damages from fraud or willful misconduct, or either party's repudiation of the contract in an unpermitted manner.[130]  These types of damages are thus excluded from § 23(b)'s cap.

The trust contends that this case falls within one of those exceptions – the exception for improper repudiation of the contract.  On that basis, it argues that § 23(a)'s prohibition on consequential damages is inapplicable.  Importantly, however, the structure of the agreement makes plain that § 23(b)'s exclusions apply only to the damages cap of § 23(b), *not to* the types of damages barred by § 23(a).  As the contractual language and structure of the agreement make clear, these subsections serve different purposes and operate independently of each other.  The categories excluded from § 23(b)'s damages cap are exclusions *only* from that cap.

---

[128] *Id.* § 23(b).

[129] D.I. 52-1 § 23(b).

[130] *Id.*

Since the damages the trustee seeks are expressly excluded from recovery by the plain language of the agreement, those portions of the complaint seeking recovery of these damages will be dismissed.

### B.    The doctrine of failure of the essential purpose is inapplicable.

The doctrine of failure of the essential purpose applies when a limitation on damages operates to deprive "a party [of] … its contractual remedy."[131]  At bottom, when a limitation on damages leaves a party "with virtually no remedy whatsoever in the event of a bad faith breach of contract, … the limited remedy could be said to 'fail of its essential purpose.'"[132]

Most commonly, the doctrine applies "when the buyer's remedy is exclusively limited to repair or replacement of defective goods, and the seller is unable to repair or replace the goods to conform to the warranty."[133]  In such a case, enforcement of the contractual limitation of remedies effectively leaves the non-breaching party with no remedy at all for the breach, in which case the agreement would "fail of its essential purpose," and the contractual limitation on damages would thus be disregarded.

---

[131] *Soo Line R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1371 n.7 (8th Cir. 1977) ("Section 2-719(2) becomes operative when a party is deprived of its contractual remedy.").  *See* Ark. Code Ann. § 4-2-719 (West) ("[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available.").

[132] *Autoforge, Inc. v. American Axle & Mfg., Inc.*, 2006 WL 2290376, at *2 (W.D. Pa. Aug. 8, 2006).

[133] *Ciba-Geigy Corp. v. Alter*, 834 S.W.2d 136, 147 (Ark. 1992).

The simple fact that a contract limits the types of damages available in the event of breach, however, does not cause a remedy to fail of its essential purpose.[134] Such a claim proves too much. If every provision that operated to deprive a contractual party from recovering some measure of damages that they may have suffered were invalid on the ground that doing so causes the agreement to fail of its essential purpose, the doctrine would mean that *no* limitation of damages provision would be enforceable. That cannot be the case.[135]

In this case, faced with the language of the agreement, the trust argues that, to the extent the recovery of the consequential damages it seeks is barred by the contract, the remedy fails of its essential purpose. But as discussed above, a simple limitation of consequential damages, without more, does not cause a remedy to fail of its essential purpose.[136] Here, as was the case in *Ciba-Geigy*, "we are not dealing with a seller who failed to correct a defect after being asked to do so by the buyer," nor is it a case in which "a party has been deprived of its contractual remedy."[137] There are, and the trust seeks, other types of damages available under the contract. If the trust

---

[134] *Hill v. BASF Wyandotte Corp.,* 696 F.2d 287, 292 (4th Cir. 1982) (finding that a liability limitation provision could not fail of its essential purpose simply because claimed damages were not obtainable due to a limitation provision, since "[t]his would of course turn the [liability limitation] provision on its head since it would always prevent imposition of any limitation that might prevent recovery of particular relief sought").

[135] *See Ciba-Geigy Corp.*, 834 S.W.2d at 147 (finding failure of the essential purpose inapplicable in a case in which the defendant had "not limited or substituted [the plaintiff's] remedy to repair or replacement of the defective goods and has only limited its liability for consequential damages").

[136] *Id.*

[137] *Id.*; *Soo Line R. Co.*, 547 F.2d at 1371 n.7.

demonstrates its entitlement to those damages, they will be awarded. The trust makes no argument that these damages are not available or that it is being deprived of them. As a result, since a limitation of liability provision, without more, does not cause a remedy to fail of its essential purpose, and the trust does not allege facts showing that the remedy has failed of its essential purpose, the doctrine of failure of the essential purpose is not applicable.

### C.    Walmart did not tacitly agree to assume responsibility for consequential damages.

Arkansas law may allow a party to recover consequential damages if the plaintiff can prove that the defendant tacitly agreed to be liable for such damages.[138] To allow for such recovery, the Arkansas Supreme Court has recognized that the party charged with the tacit agreement must "reasonably believe[] that he accepts the contract with the special condition [of consequential damages] attached to it."[139] In evaluating whether such a tacit agreement has been made, a court looks to the "facts and circumstances."[140]

---

[138] *See Deck House, Inc. v. Link*, 249 S.W.3d 817, 825 (Ark. Ct. App. 2007) ("In order to recover consequential damages in a breach-of-contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility.").

[139] *Hooks Smelting Co. v. Planters' Compress Co.*, 79 S.W. 1052, 1056 (Ark. 1904).

[140] *Id.* ("[T]he facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.").

Critically, however, such an analysis of the facts and circumstances is only necessary when the written contract is "silent as to what remedies are available."[141] Here, there is no confusion or ambiguity in the agreement. Nor is the agreement silent on the remedies available to the parties. On the contrary, as explained above, the contract expressly and unequivocally bars the recovery of consequential damages. The agreement's clear language controls, and the trustees' requests for consequential damages will be dismissed.

## II. Equitable remedies are unavailable where the plaintiff has an adequate remedy at law.

### A. Unjust enrichment, and the narrower *quantum meruit*, are inapplicable where there is an express valid and enforceable contract covering the matters at issue and none of the exceptions apply.

Unjust enrichment and *quantum meruit* are equitable doctrines.[142] These doctrines generally stand for the proposition that one should not be allowed to benefit unjustly at the expense of another.[143] The Arkansas Supreme Court has recognized

---

[141] *Bank of America, N.A. v. C.D. Smith Motor Co.*, 106 S.W.3d 425, 434 (Ark. 2003) (finding that such an inquiry into the facts and circumstances was necessary since "the parties' . . . agreement is silent as to what remedies [the plaintiff] had in the event [the defendant] defaulted on the agreement"). *See also Reynolds Health Care Servs. v. HMNH, Inc.*, 217 S.W.3d 797, 804 (Ark. 2005) ("*in the absence of such an express contrac*t to pay such special damages, the facts and circumstances" must be evaluated) (emphasis added); *Morrow v. First Nat'l Bank of Hot Springs*, 550 S.W.2d 429, 431 (Ark. 1977) (noting that "*where there is no express contract* to pay such special damages, the facts and circumstances" must be evaluated) (emphasis added).

[142] *See Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 210 S.W.3d 101, 112 (Ark. 2005); *KBX, Inc. v. Zero Grade Farms*, 639 S.W.3d 352, 365 (Ark. 2022) ("*Quantum meruit* is a claim for unjust enrichment which does not involve enforcement of a contract.").

[143] *See Servewell Plumbing*, 210 S.W.3d at 112 ("[Unjust enrichment] is the principle that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated").

that the doctrines apply to "situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another."[144]   On the other hand, in cases where there is a valid and enforceable contract fully covering the matter at issue, Arkansas courts have repeatedly recognized that "[t]here can be no unjust enrichment."[145]   To this end, "[t]he law never accommodates a party with an implied contract when he has made a specific one as to the same subject matter."[146]   To be sure, this is a general rule and does not *automatically* prevent the applicability of the doctrines when there is an applicable contract.[147]   But this rule is subject only to certain limited exceptions, none of which is alleged to be present in this case.[148]   As a result, since the general rule is that unjust enrichment and *quantum meruit* have no applicability when there exists an express contract, and none of the limited exceptions to that general rule apply, the trust's claims for unjust enrichment and *quantum meruit* will be dismissed.

---

[144] *Lowell Perkins Agency, Inc. v. Jacobs*, 469 S.W.2d 89, 92 (Ark. 1971) ("The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party seeking to charge him.") (citation omitted).

[145] *Id.* (quotation omitted).

[146] *Jackson v. Jones*, 1860 WL 796 (Ark. 1860).  *See also Adkinson v. Kilgore*, 970 S.W.2d 327 (Ark. 1998).

[147] *Campbell v. Asbury Automotive, Inc.*, 381 S.W.3d 21, 22 (Ark. 2011) ("The mere fact that there is a contract between the parties does not prevent the grant of restitution in an appropriate case.") (citation omitted).

[148] *See id.* ("Appropriate cases include those in which there has been a rescission at law . . . where a contract has been discharged by impossibility or frustration of purpose . . . or where the parties to a contract find they have made some fundamental mistake about something important in their contract.").

**B.      The remedy of conversion is unavailable for an alleged failure to pay a debt that is due under a valid contract.**

Conversion involves a party exercising dominion or control over property in a manner inconsistent with or in denial of the owner's rights.[149]  It has been recognized, though, that "[a] mere debt obligation sounding in contract . . . does not constitute conversion."[150]  This is due to the fact that "a breach of contract is not treated as a tort if it consists merely of a failure to act (nonfeasance) as distinguished from an affirmatively wrongful act (misfeasance).[151]  And that is precisely the case here.  The trustee alleges that Walmart's "refusal to remit payment constitutes conversion of Structurlam's funds."[152]  Additionally, the trustee alleges that "to the extent that Walmart retained Goods that it did not pay the respective invoices for, Structurlam retained an ownership interest in such Goods."[153]  Both simply raise nonfeasance, and at bottom allege Walmart's failure to pay amounts due under the contract.  As a result, the trustee's claim for conversion will be dismissed.

\* \* \*

At argument, however, counsel for the trust contended that even though the existing complaint invoked equitable remedies primarily as an alternative way to recover the same damages sought under its contract claim, it may separately be

---

[149] *See Thomas v. Westbrook*, 177 S.W.2d 931, 932 (Ark. 1944) ("Conversion is ordinarily said to consist of the exercise of dominion over the property in violation of the rights of the owner or person entitled to possession.").

[150] *JS Ints., Inc. v. John Hafner & Assocs.*, 2017 WL 5653873, at *2 (E.D. Ark. Feb. 10, 2017).

[151] *Morrow*, 550 S.W.2d at 432.

[152] D.I. 52 ¶ 229.

[153] *Id.* ¶ 230.

entitled to equitable relief on other grounds – such as because Walmart allegedly failed to return goods that it claims were not compliant with the contract on a timely basis, thus depriving Structurlam of the opportunity to monetize the goods. To the extent the trust seeks to amend the complaint to assert such a claim, the Court will consider such a motion to amend (without prejudice to Walmart's right to oppose such a motion) if and when it is presented. Because the existing complaint primarily (if not entirely) seeks to recover damages that are unavailable in equity, the motion to exist those portions of the existing complaint will be granted.

## Conclusion

For the foregoing reasons, Walmart's motion to dismiss the complaint in part is granted. The parties are directed to settle an appropriate order reflecting the terms of this ruling.

Dated: October 30, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE